**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

FILED

2009 JAN 14  AM 5:58

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **GOTTSCHALKS INC., a Delaware corporation,**[1] | ) | **Case No. 09-_____  (    )** |
| | ) | |
| Debtor. | ) | |
| | ) | |

**DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO
11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 (I) AUTHORIZING DEBTOR (A) TO
OBTAIN SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING AND
(B) TO UTILIZE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING
SUPER PRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING
ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES;
(IV) MODIFYING AUTOMATIC STAY AND
(V) SCHEDULING INTERIM AND FINAL HEARINGS**

Gottschalks Inc., a Delaware corporation, as a debtor and debtor in possession

(the "Debtor"), hereby submits this motion (the "Motion") for entry of an interim order

substantially in the form attached as Exhibit A hereto (the "Interim Order") and a final order (the

"Final Order" and, together with the Interim Order, the "Orders"), under Sections 105(a), 361,

362, 363, 364 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the

"Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and

Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local

Rules") (I) authorizing the Debtor (A) to enter into a financing arrangement (as amended,

modified and in effect from time to time, the "DIP Credit Facility") as provided for in that

certain $125,000,000 Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement,

---

[1] The Debtor in this case, along with the last four digits of the federal tax identification number for the Debtor, is Gottschalks Inc. (9791). The Debtor's corporate offices are located at 7 River Park Place East, Fresno, California 93720.

substantially in the form attached hereto as Exhibit B (as amended, modified and in effect from time to time, and together with any and all other related documents and agreements entered into in connection with or related to the DIP Credit Facility, including, without limitation, any fee letters, the "DIP Credit Agreement"), and (B) to use Cash Collateral (as defined below), (II) granting liens and providing super priority administrative expense status, (III) granting "adequate protection" to the Prepetition Secured Parties (as defined below), (IV) modifying the automatic stay and (V) scheduling interim and final hearings with respect to the relief requested herein. In support of the Motion, the Debtor relies upon and incorporates by reference the *Declaration of J. Gregory Ambro in Support of Chapter 11 Petition and Request for First Day Relief* (the "First Day Affidavit"),[2] which was filed concurrently herewith. In further support of the Motion, the Debtor, by and through its undersigned proposed counsel, respectfully represents:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of this Case and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief requested herein are Bankruptcy Code Sections 105(a), 361, 362, 363, 364, and 507.

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Interim Order or the DIP Credit Agreement. To the extent that there is any conflict between this Motion and the Interim Order, the Interim Order shall control.

## BACKGROUND

2.     On January 14, 2009 (the "Petition Date"), the Debtor filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned bankruptcy case.

3.     The Debtor continues to operate its business and manage its properties as a debtor in possession pursuant to Bankruptcy Code Sections 1107(a) and 1108.  No trustee, examiner or official committee of unsecured creditors has been appointed in the Debtor's Case.

4.     The Debtor is a diversified retailer operating fifty-nine (59) full-line department stores and three (3) specialty stores in six western states:  California, Washington, Alaska, Oregon, Idaho and Nevada.  It was founded in 1904 in Fresno, California, and expanded within California and the western states.  The Debtor's stores operate under the "Gottschalks" and "Village East" names and are generally large, free-standing and mall-based outlets of between 30,000 and 200,000 square feet, primarily located in mid-sized cities that are otherwise underserved by the larger national chains.  The Debtor carries a broad line of brand name and private label merchandise, including fashion clothing, shoes, cosmetics, jewelry, home furnishings and other products.  Brands carried by the Debtor include Estee Lauder, Lancome, Clinique, Chanel, Dooney & Bourke, Nine West, Liz Claiborne, Calvin Klein, Nautica, Karen Kane, Ralph Lauren, Columbia, Fossil, Levi Strauss, Southpole, Izod, Quiksilver, Roxy, Woolrich and Carters.

5.     The Debtor employs more than 5,282 full time and part time employees.  Like other retailers, the Debtor's retail sales are subject to seasonal fluctuations – approximately 33% of the Debtor's annual sales occur in the fourth fiscal quarter (November 1 through

January 31).[3]  Of its 62 retail locations, the Debtor owns 5 stores and leases the balance.  The Debtor is publicly owned.  One of its largest investors is The Harris Company ("Harris"), which sold certain stores to the Debtor in 1998 and is an affiliate of Spanish retailer El Corte Ingles.

6.    The Debtor as borrower, the lenders party thereto and General Electric Capital Corporation, as administrative agent and collateral agent ("GECC"), are parties to that certain Second Amended and Restated Credit Agreement dated as of September 26, 2007 (as amended, the "GECC Facility").  The current amount outstanding under the GECC Facility is approximately $73 million.  The obligations under the GECC Facility are secured by a lien in most of the Debtor's assets including inventory, accounts receivable, equipment, most (but not all) of its real property, and intellectual property (among other things).  The Debtor's principal unsecured obligations consist of, among others, a note in favor of Harris with an outstanding principal amount of approximately $16 million and approximately $29 million owed to its trade vendors.

7.    In November 2008, the Debtor signed an agreement with Everbright Development Overseas Securities, Ltd., a British Virgin Islands corporation ("Everbright"). Everbright agreed to invest up to $30 million in exchange for common stock of the Debtor.  The Everbright transaction was subject to a diligence condition through December 15, 2008.

8.    Shortly after the Everbright agreement was signed, the Debtor was advised that (a) new, lower appraisals conducted by independent appraisers of the value of the Debtor's inventory and other assets that comprise the "borrowing base" and control the Debtor's asset-based credit facility agented by GECC and (b) reserves due to a decline in the Debtor's same-store sales trends in the current retail environment would lead to a reduction in the Debtor's

---

[3]    The Debtor's fiscal year ends on the Saturday nearest to January 31.

liquidity compared to budget under its credit line ranging from approximately $18 million in December 2008 to a projected $12 million in January, 2009. The Debtor had not anticipated the adjustments at the time it entered the proposed transactions with Everbright. GECC agreed to delay certain of the adjustments in availability under the credit facility for a period of time.

9.    Everbright subsequently advised the Debtor that it was unable to go forward with its proposed investments, at least as it was previously structured. The Debtor attempted to modify the amount of the proposed investment from Everbright or raise additional capital from third parties (principally its existing investor, Harris). However, the Debtor's efforts to secure such infusion of funds outside of a chapter 11 proceeding were ultimately unsuccessful, and its sales (like those of virtually all retailers) continued to be impacted by the very weak retail and credit environment. The combination of these factors (and the resulting impact on its access to cash and its line of credit) resulted in the filing of this case.

10.    The Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on January 14, 2009 (the "Petition Date"). The Debtor intends to use this chapter 11 case to (i) gain access to liquidity, and (ii) execute on one or more options to create value for stakeholders (including a sale of assets or other transaction with a third party investor). The Debtor is considering all possible options for maximizing stakeholder value. Among other things, it will focus on the sale of certain portions or all of its business as well as other third party investments and asset disposition options.

11.    GECC and the other prepetition secured lenders have agreed to provide postpetition financing to the Debtor and have consented to the use of their cash collateral. The proposed DIP Credit Facility will provide the Debtor with cash advances and other extensions of credit in an aggregate principal amount not to exceed $125 million. The proposed DIP Credit

Facility contemplates a dual track sales process to market the Debtor's business as a going concern, while also seeking liquidation bids, with a closing approximately 60 days after the Petition Date.

12.     The Debtor plans to seek approval for a sale process using the following timetable (which is incorporated into the DIP Credit Facility): the acceptance of a stalking horse bid on or about March 2, 2009 and an auction on or about March 17, 2009.  The sale would close on an agreed schedule.  To further its sale efforts, the Debtor has retained FTI Consulting, Inc. as its financial advisor and Financo, Inc. ("Financo") to act as its investment banker.  Financo served as the Debtor's investment banker prior to the Petition Date and is very familiar with the Debtor.  It is already working with interested investors and potential buyers.  The Debtor believes that the DIP Credit Facility gives it the liquidity to execute on its sale effort.

## RELIEF REQUESTED

13.     By this Motion, the Debtor seeks entry of the Interim and Final Orders, inter alia:[4]

(a)     under Bankruptcy Code Sections 364(c), (d) and (e), authorizing the Debtor to obtain postpetition financing consisting of a revolving credit and letter of credit facility from GECC and the other lenders from time to time party to the DIP Credit Agreement (collectively, the "DIP Lenders"), with funds thereunder available for use in accordance with the budget (as amended, modified or updated in accordance with the DIP Credit Agreement, the "DIP Budget") and the other terms set forth in the DIP Credit Agreement;

(b)     under Bankruptcy Code Section 364(c)(1), and subject to the Carve-Out and certain other administrative claims, granting super priority claim status to the claims of the DIP Lenders under the DIP Credit Agreement;

(c)     under Bankruptcy Code Sections 364(c)(2), (c)(3) and (d), as security for the repayment of the borrowings and all other obligations arising under the DIP Credit Agreement, authorizing the Debtor to grant to GECC, as administrative and collateral agent for the DIP Lenders under the DIP Credit Agreement (in such capacity, the

---

[4]  Payments to be made pursuant to the First Day Orders are subject to the terms of the Interim Order and the DIP Credit Agreement.

"Administrative Agent") security interests in and liens upon the Collateral, subject to the Carve-Out and other priority liens;

(d)    under Bankruptcy Code Sections 361, 363(c)(2) and 363(e), authorizing the Debtor to use the Prepetition Collateral, including the Cash Collateral (each as defined in the Interim Order), and to provide certain protections with respect to any diminution in the value of the Prepetition Secured Parties' interest in the Prepetition Collateral resulting from the implementation of the DIP Credit Facility, the liens and security interests sought herein to secure the DIP Credit Facility, the use, sale or lease of the Prepetition Collateral or the imposition of the automatic stay pursuant to Bankruptcy Code Section 362;

(e)    under Bankruptcy Code Sections 363 and 364, authorizing the Debtor to use the proceeds of the DIP Credit Facility for, among other things, refinancing the obligations under the Prepetition Credit Facility,[5] working capital and general corporate purposes, payment of costs of administration of the Case and payment of prepetition expenses, in each case, as contemplated in the DIP Credit Agreement and as approved by the Court;

(f)    under Bankruptcy Code Section 362, modifying the automatic stay to the extent set forth in the DIP Credit Agreement;

(g)    pursuant to Bankruptcy Rule 4001, scheduling a preliminary hearing on this Motion and authorizing the Debtor from the entry of the Interim Order until the final hearing (the "Final Hearing") to obtain credit under the terms contained in the DIP Credit Agreement and to utilize Cash Collateral to the extent necessary to avoid immediate and irreparable harm to the Debtor's estate; and

(h)    pursuant to Bankruptcy Rule 4001, scheduling a Final Hearing on this Motion and establishing notice procedures in respect of the Final Hearing by this Court to consider entry of the Final Order authorizing the Debtor to borrow the balance of the DIP Credit Facility on a final basis.

14.    The relief requested herein is further designed to facilitate a sale of some or all of the Debtor's assets pursuant to the Trigger Events schedule attached hereto as Exhibit C.

---

[5] The proposed Interim Order provides for gradual repayment of the Prepetition Secured Obligations from the proceeds of collateral, with operating funds to be advanced under the DIP Credit Facility. The parties intend to seek approval in connection with the Final Order for DIP Credit Facility proceeds to be used to satisfy the Prepetition Obligations in full, with appropriate reservation of rights for a Statutory Committee to investigate and challenge such obligations, but the parties do not seek such approval for purposes of the Interim Order.

## BASIS FOR RELIEF REQUESTED

**A.      The Debtor's Decision To Enter Into The DIP Credit Agreement**

15.      All of the Debtor's cash from its ordinary course operations and sale of inventory pre-petition was subject to a pre-petition cash sweep under the Prepetition Loan Agreement.  While the Debtor has previously sold (and may hereafter sell) assets outside of the ordinary course of business, it does not believe that such sales (or use of cash collateral alone) would be a superior alternative to the financing that it seeks to have approved by way of this Motion.  To the extent of any shortfall in receipts post-petition, the Debtor would be unable to operate its business or execute on its sale effort.  Moreover, the Debtor's forecasts suggest that it would not be able to replenish the collateral it would use to generate cash for operations during the post-petition period if it attempted to simply live off of the sales of inventory post-petition.  If sales fell or expected receipts did not come, the Debtor's restructure would be imperiled.  The new facility gives the Debtor appropriate flexibility.  The Debtor needs this cash and working capital financing, and its estate and creditors will greatly benefit from its approval.

16.      In conjunction with FTI, the Debtor considered whether it could operate using only the cash generated from its post-petition operations.  It determined that it could do so only for a limited period of time and then only if it refrained from making purchases and payments that are critical to the success of this case based on its current forecasts.  The case is commencing at the slowest period for retail sales.  However, the Debtor's expenditures during this period (such as payroll and other essential payments) cannot be reduced to account for the lower sales volume.  See First Day Affidavit at ¶ 24.  As a result, the Budget shows that the Debtor will need to make significant net borrowings under the DIP Credit Agreement.

17.      Moreover, the availability of postpetition financing will provide more than just the necessary cash for the Debtor to operate its business.  Any buyer looking to acquire the

Debtor as a going concern will want to ensure that the Debtor's operations remain stable and contain fresh inventory. Also important is the sense of confidence that the financing will instill in the suppliers, customers and employees of the Debtor. The failure of the Debtor's suppliers and employees to provide goods and services to the Debtor at this time, and the corresponding loss of customer patronage, could have a deeply negative effect on the Debtor's ability to seek bids for the business as a going concern. See First Day Affidavit at ¶ 25.

18.     If cash is not available to maintain operations during the post-filing period, the Debtor faces a substantial and devastating loss of revenue and other irreparable harm from loss of employees and employee moral and deteriorating relationships with suppliers – all of which will adversely affect the value of the Debtor's business. The ability of the Debtor to remain viable operating entities depends on obtaining the interim and final relief requested in this Motion. See First Day Affidavit at ¶ 26. The Prepetition Agent, Prepetition Lenders, proposed DIP Agent and DIP Lenders have indicated that the DIP Credit Facility sets forth the only terms under which it would consent to use of cash collateral. Of course, an effort to use the Prepetition Agent's and Lenders' cash collateral without their consent might be unsuccessful. For the reasons discussed above, the Debtor does not believe that such a path is prudent. See First Day Affidavit at ¶ 27.

19.     Before agreeing to enter into the DIP Credit Facility, the Debtor made extensive inquiry into its alternatives for DIP financing and solicited proposals for debtor in possession from other financial institutions. These included members of the existing syndicate of banks, other financial institutions who historically provide debtor in possession financing, and the Debtor's major pre-petition investors. The Debtor contacted 8 potential lenders, including its pre-petition lenders. No lender was willing to provide the necessary financing without the type

of protections afforded under the DIP Credit Facility.  None offered terms that were superior to the proposed DIP Credit Facility.  Additionally, GECC was familiar with the Debtor, giving it the ability to act more quickly.  See First Day Affidavit at ¶ 28.

20.    As negotiated, the DIP Credit Facility will enable the Debtor to pay operating expenses, compensate its employees and purchase inventory and otherwise maximize the value of its business.  See First Day Affidavit at ¶ 29.

21.    The Debtor negotiated the terms of the DIP Credit Facility with GECC and the proposed DIP Lenders at arms' length and in good faith, with all parties represented by counsel.  The Debtor believes that the negotiated terms are the best available under the circumstances.  Indeed, the terms and conditions of the financing to be provided under the proposed DIP Credit Facility are more favorable – or as favorable – to the Debtor (on the basis of price and other factors) than those available from other lenders.  See First Day Affidavit at ¶ 30.

**B.    Terms of the DIP Credit Agreement**

22.    The principal terms of the DIP Credit Agreement are as follows:[6]

| | |
|---|---|
| **Administrative Agent:** | GECC |
| **DIP Lenders:** | GECC and the other lenders party from time to time thereto |
| **Letter of Credit Issuer:** | The Administrative Agent or its designee |
| **Borrowers:** | Gottschalks Inc. (as debtor and debtor in possession in the Case) |
| **DIP Credit Facility:** | The DIP Credit Facility will consist of a senior revolving credit facility (the "Revolver") in a committed amount of $125,000,000 |
| **Commitment Termination Date:** | The date that is the earliest of the following: the earliest of |

---

[6] This summary is qualified in its entirety by the provisions of the DIP Credit Agreement and the Interim Order.  In addition, the Interim Order remains subject to continuing negotiations among parties in interest.  The Debtor reserves all rights in connection with the Interim Order.

(a) July [___], 2009, (b) the date of termination of Lenders' obligations to make Advances and to incur Letter of Credit Obligations or permit existing Loans to remain outstanding pursuant to Section 8.2(b), (c) the date of indefeasible prepayment in full by Borrower of the Loans and the cancellation and return (or stand-by guarantee) of all Letters of Credit or the cash collateralization of all Letter of Credit Obligations pursuant to Annex B, and the permanent reduction of all Commitments to zero dollars ($0) and funding of the Carve-Out, (d) [intentionally omitted], (e) thirty (30) days following the Petition Date if the Final Order has not been entered by the Bankruptcy Court by such date, (f) the date upon which the Interim Order expires, unless the Final Order shall have been entered and become effective by such date, (g) the close of business on the first Business Day after the entry of the Final Order, if by that time Borrower has not paid Agent the fees required under the GE Capital Fee Letter, unless the Agent and the Lenders agree otherwise, (h) the date of entry of an order of the Bankruptcy Court confirming a plan of reorganization in the Chapter 11 Case that fails to provide for the indefeasible payment in full in cash of all Obligations under the Agreement and the other Loan Documents and the Prior Lender Obligations under the Pre-Petition Loan Agreement and the other Pre-Petition Loan Documents on the effective date of such plan, (i) the date of the closing of a sale of all or substantially all of the Borrower's assets pursuant to Section 363 of the Bankruptcy Code, a confirmed plan of reorganization, or a liquidation pursuant to Chapter 7 of the Bankruptcy Code, and (j) if a plan of reorganization that has been consented to by the Agent or that provides for payment in full in cash of all Obligations under the Agreement and the other Loan Documents and the Prior Lender Obligations under the Pre-Petition Loan Agreement and the other Pre-Petition Loan Documents has been confirmed by order of the Bankruptcy Court, the earlier of the effective date of such plan of reorganization or the sixtieth day after the date of entry of such confirmation order.

**Budget:**

Use of the Revolver shall be limited in accordance with the Approved DIP Budget (subject to permitted variances set forth in the DIP Credit Agreement) set forth on a weekly basis cash revenue, receipts, expenses and disbursements and other information for the first 10

weeks from the closing date of the DIP Credit Facility, with subsequent updates every 10 weeks.

**Reserves:**

The Agent shall have the right to implement reserves in connection with the Borrowing Base with respect to (a) a reserve or reserves in the full amount of the Carve-Out Amount, (b) a reserve, established by the Agent in its reasonable credit judgment, in respect of any leased location of the Borrower in a Landlord Lien State where Collateral is located (which shall be based on the Permitted Pre-Petition Liens that may be applicable with respect to any such leased location), unless (i) the applicable landlord has executed and delivered landlord waiver (in form and substance reasonably satisfactory to Agent) or (ii) a Final Order has been entered addressing landlord liens and collateral access issues with respect to such leased location to the reasonable satisfaction of the Agent, (c) a reserve in an amount equal to 50% of the amount of all outstanding gift cards, (d) a reserve, in an amount established by Agent in its reasonable credit judgment, in respect of (i) Inventory held at any leased or rented location to be closed with respect to which the lease therefor is to be terminated by Borrower, (ii) Inventory at leased locations with respect to which the lease has not been assumed commencing on the Lease Assumption Reserve Commencement Date, or with respect to any specific location, the date that is 11 weeks (or, if the length of the liquidation period assumed in the Inventory appraisals received by Agent on or about the Closing Date is shorter or longer, such period plus 4 weeks) prior to the expiration of such period of time as shall have been consented to for rejection/assumption of such lease by the landlord for such location and approved by the Bankruptcy Court, or (iii) Inventory held at any leased location as to which a rejection of the lease has been effected, in each case in an amount determined by the Agent in its reasonable discretion, and (e) such other reserves that Agent may, in its reasonable credit judgment, establish from time to time.

**Use of Proceeds:**

As a condition to the entry into the DIP Agreement, the extension of credit under the DIP Facility and the agreement for the use of Cash Collateral, the DIP Agent and DIP Lenders require, and the Debtor has agreed that proceeds of the DIP Facility shall be used in a manner consistent with the terms and conditions of the DIP Documents and in accordance with and to the extent set

forth in the budget (as the same may be modified from time to time with the consent of the DIP Agent and the DIP Lenders, consistent with the terms of the DIP Documents and subject to such variances as permitted by the DIP Documents, the "<u>Budget</u>"), solely for (a) working capital, letters of credit, and other general corporate purposes, (b) permitted payment of costs of administration of the Case, and (c) payment of such prepetition expenses as have been or hereafter are consented to by the DIP Agent, in its reasonable discretion, and are approved by the Court

**Application of Proceeds:**

As a condition to the entry into the DIP Documents, the extension of credit under the DIP Facility and the authorization to use Cash Collateral, the Debtor has agreed that proceeds of DIP Collateral, Prepetition Collateral, any amounts held on account of the DIP Collateral or Prepetition Collateral, and all payments and collections received by the Debtor shall be applied as follows:

(a) Prior to the Termination Declaration Date or Commitment Termination Date: (i) *first*, to permanently reduce the Prepetition Obligations in accordance with the Prepetition Credit Documents until indefeasibly paid in full in cash including without limitation to repay outstanding Swap Related Reimbursement Obligations (as defined in the Prepetition Credit Documents) and cash collateralize contingent Swap Related Reimbursement Obligations under the Prepetition Credit Documents in an amount equal to 105% of any Swap Related L/Cs (as defined in the Prepetition Credit Agreement), subject to paragraph 34 of the Interim Order; and (ii) *second*, to reduce the DIP Obligations then due and owing in accordance with the DIP Documents and the Interim Order.

Upon the earlier of the Termination Declaration Date or the Commitment Termination Date, and at all times upon receipt of payments in connection with a sale or disposition of DIP Collateral outside the ordinary course of business: (i) *first*, to permanently reduce the DIP Obligations and all other obligations owing to the DIP Agent and/or the DIP Lenders until indefeasibly paid in full in cash and cash collateralize, obtain back to back and/or cancel all outstanding letters of credit issued or

deemed issued under the DIP Documents in accordance with the DIP Documents and the Interim Order; (ii) *second*, to the extent not already funded, to fund the DIP Indemnity Account (as defined in the Interim Order); (iii) *third*, to permanently reduce the Prepetition Obligations until indefeasibly paid in full in cash, including without limitation repay outstanding Swap Related Reimbursement Obligations (as defined in the Prepetition Credit Documents) and cash collateralize contingent Swap Related Reimbursement Obligations under the Prepetition Credit Documents in an amount equal to 105% of any Swap Related L/Cs (as defined in the Prepetition Credit Agreement); (iii) *fourth*, to the extent not already funded, to fund the Prepetition Indemnity Account; and (v) *fifth*, to the estate. Following the Termination Declaration Date or Commitment Termination Date, as the case may be, prior to application of proceeds in the immediately preceding sentence funds sufficient to fund the Carve-Out shall first be wired to the Debtor. The Debtor shall hold these funds in an interest-bearing account in trust for the benefit of parties claiming under the Carve-Out, and upon satisfaction of all such claims any remaining funds shall be returned to the DIP Agent for application in accordance with the Interim Order.

**Interest Rates:**

At either Index Rate *plus* the Applicable Revolver Index Margin or LIBOR Rate *plus* the Applicable Revolver LIBOR Margin. [Swing Line at Index Rate *plus* the Applicable Revolver Index Margin]

**Applicable Margins:**

| | |
|---|---|
| Applicable Revolver Index Margin | 2.25% |
| Applicable Revolver LIBOR Margin | 4.00% |
| Applicable L/C Margin | 4.00% |
| Applicable Unused Line Fee Margin | 0.50% |

**Default Rate:**

The rate otherwise in effect plus 2.00%, payable on demand

**Closing Fee:**

2% on the aggregate amount of the commitments under the DIP Credit Facility, payable on the closing date[7]

**Letter of Credit Fee:**

Equal to the Applicable L/C Margin multiplied by the maximum amount available to be drawn under the applicable Letter of Credit, payable monthly in arrears, plus any related costs, expenses and charges

**DIP Credit Facility Claims and Liens:**

*DIP Liens*:

Effective immediately upon the execution of the Interim Order, (a) the DIP Agent is granted, for the benefit of itself and the DIP Lenders, continuing, valid, binding, enforceable, non-avoidable and automatically and properly perfected postpetition security interests in and liens on (the "DIP Liens") any and all personal property, real property and other assets of the Debtor, tangible and intangible, whether now owned by or owing to, or hereafter acquired by or arising in favor of the Debtor, whether owned or consigned by or to, or leased from or to the Debtor (to the full extent of the Debtor's interest therein), and regardless of where located, including, without limitation, the following (collectively, the "DIP Collateral")[8]: (i) all Accounts (including, without limitation, all Credit Card Receivables); (ii) all Chattel Paper; (iii) all Documents; (iv) all General Intangibles (including, without limitation, all payment intangibles, all Intellectual Property and all Software); (v) all Goods (including, without limitation, Inventory, Equipment and Fixtures); (vi) all Instruments; (vii) all Investment Property; (viii) all Deposit Accounts, including all Blocked Accounts, Concentration Accounts, Disbursement Accounts, and all other bank accounts and all deposits therein; (ix) all money, cash or cash equivalents; (x) all Supporting Obligations and Letter-of-Credit Rights; (xi) all Commercial Tort Claims; (xii) all books, records, and information relating to any of the foregoing and/or to the operation of the Debtor's business, and all rights of access to such books, records and information, and all property in which such books,

---

[7] The early termination fee that is part of the Prepetition Obligations shall be treated in accordance with the agreement among the parties as set forth in the DIP Motion and the Fee Letter issued in connection with the DIP Credit Agreement.

[8] All defined terms in the description of DIP Collateral shall have the meanings ascribed thereto in the DIP Documents. All terms not specifically defined in the DIP Documents shall have the meanings ascribed to such terms in Article 8 or 9 of the Uniform Commercial Code.

records, and information are stored, recorded and maintained; (xiii) all owned real estate and leaseholds as described in the Interim Order; (xiv) all proceeds of Leases and Leaseholds[9]; (xv) all Trademark Collateral; (xvi) proceeds of Excluded Collateral[10]; (xvii) avoidance power claims or actions under section 549 of the Bankruptcy Code and the proceeds thereof; (xviii) rights under section 506(c) of the Bankruptcy Code and the proceeds thereof resulting from section 506(c) charges against parties other than the Prepetition Agent, Prepetition Lenders, DIP Agent or DIP Lenders; (xix) any residual amounts in the Sales Tax Account (as defined in the Interim Order) after satisfaction of all sales and use taxes, and all tax refunds (including, without limitation sales tax refunds); (xx) any account established and maintained to hold any deposits to provide utility providers with adequate assurance of future performance (the "Utility Deposit Account"), and any residual amounts in the Utility Deposit Account after satisfaction of any payments to any utility provider; (xxi) all Prepetition Collateral; and (xxii) to the extent not otherwise included, all Proceeds, tort claims, insurance claims and other rights to payments not otherwise included in the foregoing and proceeds and products of the foregoing and all accessions to, substitutions and replacements for, and rents and profits of, each of the foregoing. The Prepetition Agent, Prepetition Lenders, DIP Agent and DIP Lenders have not requested liens on avoidance actions and the proceeds thereof under chapter 5 of the Bankruptcy Code (other than section 549) for purposes of the Interim Order but have reserved the right to seek liens on these assets and the proceeds thereof as collateral for purposes of the Final Order. The Prepetition Liens shall continue, shall inure to the benefit of the DIP Agent and DIP Lenders, shall secure the DIP Obligations, and shall be included in the definition of "DIP Liens."

*DIP Lien Priority*:
The DIP Liens securing the DIP Obligations shall be junior to the (a) Carve Out and (b) Permitted

---

[9] With respect to leaseholds that were not subject to leasehold mortgages in favor of the Prepetition Agent as of the Petition Date, the DIP Liens and Adequate Protection Liens (as defined in the Interim Order) extend only to the proceeds of leased real property and are not direct liens on those leases.

[10] The DIP Collateral excludes the "Excluded Collateral" consisting of the Debtor's interest in Park 41, a California limited partnership, for so long as a pledge of that interest would violate the applicable partnership agreement.

Encumbrances and shall otherwise be senior in priority and superior to all other security interests, mortgages, collateral interests, liens or claims on or to any of the DIP Collateral. Other than as set forth in the Interim Order, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Case or any Successor Case. The DIP Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Case or any Successor Case, upon the conversion of any of the Case to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of the Case or Successor Case. The DIP Liens shall not be subject to sections 506(c), 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of any estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the DIP Liens.

*DIP Superpriority Claim*:
Upon entry of the Interim Order, the DIP Agent and DIP Lenders are granted an allowed superpriority administrative expense claim in the Case and any Successor Case (collectively, the "DIP Superpriority Claim") for all DIP Obligations. The DIP Superpriority Claim shall be subordinate only to the Carve Out, and shall otherwise have priority over any and all administrative expenses and unsecured claims against the Debtor or its estate in the Case and any Successor Case, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114, and any other provision of the Bankruptcy Code, and (c) at all times be senior to the rights of the Debtor and its estate, and any successor trustee or other estate representative to the extent permitted by law.

**Adequate Protection Claims and Liens of Prepetition Lenders:**

*Adequate Protection Liens*:
Pursuant to section 361, 363(e), and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Agent and Prepetition Lenders in the Prepetition Collateral against any Diminution in Value of such interests, the Debtor grants to the Prepetition Agent, for the benefit of itself and the Prepetition Lenders,

continuing valid, binding, enforceable, non-avoidable and automatically perfected postpetition security interests in and liens on the DIP Collateral (the "Adequate Protection Liens").

*Priority of Adequate Protection Liens.*

The Adequate Protection Liens shall be junior only to: (i) the Carve Out, (ii) the DIP Liens, (iii) the Prepetition Liens, and (iv) Permitted Encumbrances. The Adequate Protection Liens shall otherwise be senior to all other security interests, mortgages, collateral interests, liens or claims on or to any of the DIP Collateral. Except as provided in the Interim Order, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereafter entered in the Case or any Successor Case, and shall be valid and enforceable against any trustee appointed in the Case or any Successor Case, or upon the dismissal of the Case or any Successor Case. The Adequate Protection Liens shall not be subject to sections 506(c), 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the Adequate Protection Liens.

*Adequate Protection Superpriority Claims.*

As further adequate protection of the interests of the Prepetition Agent and Prepetition Lenders in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Agent and Prepetition Lenders are each hereby granted as and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in the Case and any Successor Case (the "Adequate Protection Superpriority Claims").

*Priority of Adequate Protection Superpriority Claims:*

The Adequate Protection Superpriority Claims shall be junior only to the (i) Carve Out, (ii) DIP Superpriority Claim, and (iii) the Prepetition Obligations. Except as set forth in the Interim Order, the Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the Debtor or its estate, now existing or hereafter

arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code.

**Carve-Out:**

As used in the Interim Order, the "<u>Carve Out</u>" means, upon the earlier to occur of the Termination Declaration Date or Commitment Termination Date, the following expenses: (i) statutory fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6); and (ii) subject to the terms and conditions of the Interim Order, the allowed and unpaid professional fees and disbursements incurred by the Debtor and any Statutory Committee for any professionals retained by final order of the Court (which order has not been reversed, vacated, or stayed, unless such stay has been vacated) by the Debtor and any Statutory Committee under sections 327 or 1103(a) of the Bankruptcy Code (the "<u>Case Professionals</u>") in an aggregate amount (the "<u>Case Professionals Carve Out</u>") not in excess of $2 million, plus all incurred and unpaid professional fees and disbursements of such Case Professionals incurred prior to the Termination Declaration Date or Commitment Termination Date, as the case may be, to the extent allowed or later allowed by order of the Court (which order has not been reversed, vacated, or stayed, unless such stay has been vacated) under sections 328, 330 and/or 331 of the Bankruptcy Code and any interim compensation procedures order (the "<u>Allowed Professional Fees</u>"), <u>but solely</u> to the extent such Allowed Professional Fees were incurred in accordance with the Budget and were reflected as estimated fees and expenses of Case Professionals in the most recent Borrowing Base Certificate (as defined in the DIP Agreement) delivered by the Debtors to the DIP Agent prior to the Termination Declaration Date or the Commitment Termination Date, as the case may be (the "<u>Carve Out Amount</u>").

The DIP Agent, DIP Lenders, Prepetition Agent, and Prepetition Lenders shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Case Professionals incurred in connection with the Case or any Successor Case under any chapter of the

Bankruptcy Code. Nothing in the Interim Order or otherwise shall be construed (i) to obligate the DIP Agent, DIP Lenders, Prepetition Agent or Prepetition Lenders, in any way to pay compensation to or to reimburse expenses of any Case Professional, or to guarantee that the Debtor has sufficient funds to pay such compensation or reimbursement; (ii) to increase the Carve Out if actual Allowed Professional Fees are higher in fact than reflected in the Budget or estimated fees and disbursements of Case Professional reflected in any Borrowing Base Certificate; or (iii) as consent to the allowance of any professional fees or expenses of any Case Professionals. Any funding of the Carve Out shall be added to and made a part of the DIP Obligations and secured by the DIP Collateral and otherwise entitled to the protections granted under the Interim Order, the DIP Documents, the Bankruptcy Code and applicable law. The DIP Agents' and DIP Lenders' liens and claims shall, however, be subject to the Carve Out as set forth in the Interim Order.

**Events of Default:**

In addition to other usual and customary events of default for facilities of this type, the following will constitute Events of Default under the DIP Credit Facility: The occurrence of any of the following in the Chapter 11 Case: (i) the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by Borrower in the Chapter 11 Case: (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to the Agreement; (B) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral other than as expressly permitted by the Agreement; or (C) except as provided in the Interim Order or Final Order, as the case may be, to use cash collateral under Section 363(c) of the Bankruptcy Code without the prior written consent of the Agent and the Requisite Lenders; (ii) (A) the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by a Credit Party or any other Person to which the Lenders and the Agent do not consent or otherwise agree to the treatment of their claims, (B) the entry of any order terminating any Credit Party's exclusive right to file a plan of reorganization, or (C) the expiration of any Credit Party's exclusive right to file a plan of reorganization (unless extended); (iii) the entry of an order in the Chapter 11 Case confirming a plan of reorganization that does not contain a provision for termination of the Commitments and indefeasible repayment in full in cash of all of the Obligations under the Agreement and the Prior Lender Obligations on or before the effective date of such plan or plans; (iv) the entry of an order amending, supplementing, staying, vacating or otherwise modifying (a) the Interim Order, the Final Order or the Cash Management Order without the written consent of all of the Lenders or (b) the Loan Documents without the consent of the Lenders required pursuant to Section 11.2; (v) the Final Order is not entered before or immediately following the expiration of the Interim Order, and in any event within 30 days after the Petition Date; (vi) the payment of, or application for authority to pay, any Pre-Petition claim, without (A) the Agent's and Requisite Lenders' prior written consent other than payments made in accordance with the Approved Budget or as otherwise permitted under the Agreement (including payments made

in accordance with the First Day Orders) and (B) the entry of a court order authorizing such payment; (vii) subject to the entry of the Final Order, the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Agent, any Lender or any of the Collateral or against the Prior Agent, any Prior Lender or any Collateral (as defined in the Pre-Petition Loan Agreement); (viii) the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of a receiver or an examiner in the Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Borrower; or the sale without the Agent and Lenders' consent, of all or substantially all of the Borrower's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Case, or otherwise that does not provide for payment in full in cash of the Obligations and the Prior Lender Obligations and termination of Lenders' commitment to make Loans; (ix) the dismissal of the Chapter 11 Case, or the conversion of the Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or any Credit Party shall file a motion or other pleading seeking the dismissal of the Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise; (x) the entry of an order by the Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority, which in either case involves a claim of $500,000 or more; (xi) the entry of an order by the Bankruptcy Court that has the effect of subordinating (A) any or all of the Obligations or Liens of Agent or any Lender under the Loan Documents or (B) the Prior Lender Obligations or the Liens of Prior Agent or any Prior Lender under the Pre-Petition Loan Documents (except with respect to the Liens of Agent or any Lender), in each case, to any other claim; (xii) the entry of an order in the Chapter 11 Case avoiding, re-characterizing any payment or characterization of proceeds, or requiring repayment of any portion of the payments made on account of the Obligations owing under the Agreement or the other Loan Documents or the Prior Lender Obligations owing under the Pre-Petition

Loan Agreement or the other Pre-Petition Loan Documents; (xiii) the failure of Borrower to perform in any material respect any of its obligations under the Interim Order, the Final Order or the Cash Management Order; (xiv) the entry of an order in the Chapter 11 Case granting any other super priority administrative claim or Lien equal or superior to that granted to Agent, on behalf of itself and Lenders, other than as expressly set forth in the Agreement or the Interim Order (or the Final Order, when applicable); (b) Failure to meet any of the "sale trigger events" set forth on Exhibit B to the Interim Order (or the Final Order, when applicable) as and when required pursuant to such Exhibit; or (c) Failure of the Bankruptcy Court to approve a Full Chain Liquidation on or before March 19, 2009 that is on terms acceptable to the Agent and the Lenders, unless a GC Sale has been approved by the Bankruptcy Court on or before March 19, 2009, the proceeds of which would be sufficient to indefeasibly repay in full, in cash, all Prior Lender Obligations plus the Obligations.

**Remedies on Event of Default:**

If any Default or Event of Default has occurred and is continuing, Agent may (and at the written request of the Requisite Lenders shall), notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, suspend the Revolving Loan facility with respect to additional Advances and/or the incurrence of additional Letter of Credit Obligations, whereupon any additional Advances and additional Letter of Credit Obligations shall be made or incurred in Agent's sole discretion (or in the sole discretion of the Requisite Lenders, if such suspension occurred at their direction) so long as such Default or Event of Default is continuing. If any Event of Default has occurred and is continuing, Agent may (and at the written request of Requisite Lenders shall), notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, except as otherwise expressly provided in the DIP Credit Agreement, increase the rate of interest applicable to the Loans and the Letter of Credit Fees to the Default Rate.

If any Event of Default has occurred and is continuing, Agent may (and at the written request of the Requisite Lenders shall), notwithstanding the provisions of Section

362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court:    (i) terminate the Revolving Loan facility with respect to further Advances or the incurrence of further Letter of Credit Obligations; (ii) reduce the Revolving Loan Commitment from time to time; (iii) declare all or any portion of the Obligations, including all or any portion of any Loan to be forthwith due and payable, and require that the Letter of Credit Obligations be cash collateralized as provided in Annex B, all without presentment, demand, protest or further notice of any kind, all of which are expressly waived by Borrower and each other Credit Party; (iv) terminate, reduce or restrict any right or ability of the Borrower to use any cash collateral (other than as expressly set forth in the Interim Order or the Final Order, as applicable, during the Remedies Notice Period), (v) subject to the Remedies Notice Period, direct any or all of the Credit Parties to sell or otherwise dispose of any or all of the Collateral on terms and conditions acceptable to the Agent pursuant to Sections 363, 365 and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct any Credit Party to assume and assign any lease or executory contract included in the Collateral to Agent's designees in accordance with and subject to Section 365 of the Bankruptcy Code), (vi) subject to the Remedies Notice Period, enter (by itself or through a designee) onto the premises of any Credit Party in connection with an orderly liquidation of the Collateral, or (vii) subject to the Remedies Notice Period, exercise any rights and remedies provided to Agent under the Loan Documents or at law or equity, including all remedies provided under the Code; and pursuant to the Interim Order and the Final Order, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated to permit Lenders to exercise their remedies under the Agreement and the Loan Documents, without further notice, application or motion to, hearing before, or order from, the Bankruptcy Court. Upon the occurrence of an Event of Default and the exercise by Agent or Lenders of their rights and remedies under the Agreement and the other Loan Documents, Borrower shall assist Agent, Lenders and their designees in effecting a sale or other disposition of the Collateral upon such terms as are acceptable to the Agent and shall assist the Agent and its designees in obtaining, and shall provide the Agent and its designees with, access and the

rights to use, at no cost or expense, the Intellectual Property of the Credit Parties and all real property owned or leased by the Credit Parties to the extent necessary, appropriate or reasonably requested in order to sell, lease or otherwise dispose of any of the Collateral.

**C.    Provisions that Potentially Implicate Local Rule 4001-2**

23.    Local Rule 4001-2 requires that certain provisions contained in the DIP Credit Agreement be highlighted and that the Debtor provide justification for the inclusion of such highlighted provision(s).

24.    Local Rule 4001-2(a)(i) provides:

Provisions to be Highlighted. All Financing Motions must (a) recite whether the proposed form of order and/or underlying cash collateral stipulation or loan agreement contains any provision of the type indicated below, (b) identify the location of any such provision in the proposed form of order, cash collateral stipulation and/or loan agreement and (c) justify the inclusion of such provision:

(A)    Provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition secured creditors (i.e., clauses that secure prepetition debt by postpetition assets in which the secured creditor would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law);

(B)    Provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the creditors' committee, if formed, at least sixty (60) days from the date of its formation to investigate such matters;

(C)    Provisions that seek to waive, without notice, whatever rights the estate may have under 11 U.S.C. § 506(c);

(D)    Provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548 and 549;

(E)    Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition

secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b);

(F)     Provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out; and

(G)     Provisions that prime any secured lien without the consent of that lienor.

25.     The Debtor believes that the following provisions of the DIP Credit Agreement are required to be identified in accordance with Local Rule 4001-2 and that such provisions are justified and necessary in the context and circumstances of this case.

**(i)     Local Rule 4001-2(a)(i)(A)**

26.     Local Rule 4001-2(a)(i)(A) requires a movant to identify provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition secured creditors (i.e., clauses that secure prepetition debt by postpetition assets in which the secured creditor would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law). See Del. Bankr. L.R. 4001- 2(a)(i)(A).

27.     The Interim Order provides that the DIP Lenders are granted postpetition security interests in and liens on all property of the Debtor. Interim Order at ¶4. The Debtor's assets that were unencumbered by the liens and security interests securing the Debtor's obligations under the Prepetition Credit Agreement are not sufficiently liquid to contribute materially to the Debtor's reasonably foreseeable operating needs. The unencumbered assets consist of real estate and leasehold interests which, in the general economic climate and particularly in the regions in which the Debtor's properties are located, would not permit the Debtor to realize reasonable value on a cost-effective basis in time to support operations. The Debtor submits that the postpetition financing proposal submitted by the DIP Lenders is the best

available under the circumstances, quickly and adequately addresses the Debtor's reasonably foreseeable liquidity needs while maintaining the going concern value of the Debtor's business, and that entry into the DIP Credit Agreement is in the best interests of the Debtor and its estate. There is no cross-collateralization, because (a) while the DIP Credit Facility provides for a "creeping" roll-up, the liens to be granted on previously unencumbered property secure the DIP Obligations, not the Prepetition Obligations, and (b) the adequate protection liens granted in connection with the Prepetition Obligations are additional/replacement liens to protect against diminution in value as expressly contemplated by Section 361 of the Bankruptcy Code. Therefore, the Debtor respectfully submits that it complies with the Local Rules.

**(ii)    Local Rule 4001-2(a)(i)(B)**

28.    Local Rule 4001-2(a)(i)(B) requires a movant to identify provisions that bind the estates or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least 75 days from the entry of the order and the creditors' committee, if formed, at least 60 days from the date of its formation to investigate such matters. See Del. Bankr. L.R. 4001- 2(a)(i)(B).

29.    The Interim Order provides (a) solely if no Statutory Committee is appointed, parties in interest (other than the Debtor and any Statutory Committee) will have at least 75 days from the entry of the order, and (b) any Statutory Committee will have at least 60 days from the date of its formation, to investigate (i) the validity, extent, priority, or perfection of the mortgages, security interests, and liens of the Prepetition Agent or any Prepetition Lender with respect to the Prepetition Collateral, or (ii) the validity, allowability, priority, fully-secured status or amount of the Prepetition Obligations.  Interim Order at ¶ 32.  As this provision affords

parties in interest the requisite investigation and challenge period, the Debtor respectfully submits that it complies with the Local Rules.

### (iii)   Local Rule 4001-2(a)(i)(C)

30.    Local Rule 4001-2(a)(i)(C) requires explicit disclosure of provisions that constitute a waiver, without notice, of the estates' rights under Bankruptcy Code Section 506(c). The Interim Order provides for a waiver of the Debtor's rights vis a vis the Prepetition Secured Parties under Bankruptcy Code Section 506(c) only upon entry of the Final Order, thus providing notice of the request.  Interim Order at ¶ 36.  As the effectiveness of this waiver will be delayed until the entry of the Final Order, the Debtor respectfully submits that parties in interest will have an opportunity to be heard and, accordingly, the waiver will not be "without notice."

### (iv)   Local Rule 4001-2(a)(i)(D)

31.    Local Rule 4001-2(a)(i)(D) requires disclosure of provisions under which the Debtor grants liens on the Debtor's claims or causes of action under 11 U.S.C. §§ 544, 545, 547, 548 and 549 (the "Avoidance Actions").  The Interim Order provides the DIP Lenders with a lien only on the proceeds of Avoidance Actions commenced under Bankruptcy Code Section 549, which the Debtor submits is appropriate because the DIP Lenders are advancing funds to the estate in reliance upon this collateral as security for the debt.  See Interim Order ¶ 6.[11]   As set forth herein, the Debtor has an immediate need to access the DIP Credit Facility and have determined that the terms of the DIP Credit Facility are the best available under the circumstances.  The Debtor respectfully submits that this limitation renders the proposed lien reasonable under the circumstances.

---

[11] The DIP Lenders have reserved the right to seek liens on avoidance actions and proceeds thereof as collateral for the purposes of the Final Order.

**(v)**    **Local Rule 4001-2(a)(i)(E)**

32.    Local Rule 4001-2(a)(i)(E) requires a description of provisions which contemplate the use of postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt.  See Del. Bankr. L. R. 4001-2(a)(i)(E).  The Debtor proposes to use the proceeds of the DIP Credit Facility to refinance its obligations under the Prepetition Credit Agreement,[12] but submits that the postpetition financing proposal submitted by the DIP Lenders is the best available under the circumstances and that entry into the DIP Credit Agreement is in the best interests of the Debtor and its estate.  Substantially all of the Debtor's liquid assets (inventory and accounts receivable) are encumbered by the liens and security interests securing the Debtor's obligations under the Prepetition Credit Agreement.  None of the potential lenders approached by the Debtor for DIP financing was willing to extend credit on a junior priority basis.  Thus, absent payment in full of the obligations owed to the Prepetition Secured Parties, the Debtor would be required to attempt to "prime" the liens of the Prepetition Secured Parties.  Even if the Debtor had been able to locate a debtor in possession lender willing to provide a priming facility, the Debtor would have risked further harm to its business if it had chosen to engage in that sort of expensive, time-consuming and uncertain litigation, including litigation as to whether such priming could occur over the objection of the Prepetition Secured Parties and whether they were adequately protected.

33.    Moreover, as set forth above, the Debtor considered a number of factors and engaged in good-faith negotiations with the DIP Lenders prior to determining to enter into the DIP Credit Agreement.  Given the Debtor's immediate liquidity needs, the DIP Lenders'

---

[12]    The proposed Interim Order provides for a gradual payment of the Prepetition Obligations, and the parties intend to seek full refinancing of these obligations only in connection with the Final Order.

ability to act quickly was a very significant factor in the Debtor's determination. The elimination of an early termination fee to the Prepetition Lenders upon Final Order in accordance with the terms of the Fee Letter was also an important aspect of the Debtor's determination to enter into the DIP Credit Agreement.

34.     Finally, refinancing the debt owed to the Prepetition Lenders will not prejudice other creditors because the Prepetition Lenders are oversecured and the Interim Order provides that the approval of the DIP Credit Facility is without prejudice to the right of any official committee appointed in this Case (or, if none, parties in interest) to contest or challenge the validity of the Prepetition Lenders' liens. See Interim Order ¶ 34. For the foregoing reasons, the Debtor respectfully submits that the refinancing of the obligations under the Prepetition Credit Agreement is appropriate in light of the circumstances of the Case.

35.     Courts have approved debtor in possession financing facilities that provided for the refinancing of prepetition indebtedness owed pursuant to secured prepetition credit facilities. See, e.g., In re Radnor Holdings Corp., Case No. 06-10894 (PJW) (Bankr. D. Del. September 22, 2006); In re Ultimate Electronics, Inc., Case No. 05-10104 (PJW) (Bankr. D. Del. Feb. 14, 2005).

**(v)     Local Rule 4001-2(a)(i)(G)**

36.     Pursuant to Local Rule 4001-2(a)(i)(G), a movant must describe provisions of the proposed debtor in possession facility which contemplate a priming of any secured lien without the consent of that lienor. See Del. Bankr. L.R. 4001-2(a)(i)(G).

37.     The DIP Credit Facility is a "priming" facility inasmuch as the liens being granted to the Dip Lenders will be senior to the existing liens of the Prepetition Secured Parties. The Prepetition Lenders have consented to the terms of the DIP Credit Facility and the Interim

and Final Orders, including the priming of those liens securing the Prepetition Credit Agreement

Obligations, on the terms and conditions set forth in the Interim Order. Moreover, the DIP

Credit Agreement leaves intact the priorities of the liens granted under the Prepetition Credit

Facility, and there is no non-consensual priming of the liens of any other party holding a valid,

enforceable, unavoidable and prior lien as of the Petition Date.

## APPLICABLE AUTHORITY

38.    Bankruptcy Code Section 364(c) provides:

If the [debtor in possession] is unable to obtain unsecured credit allowable under
section 503(b)(1) of this title as an administrative expense, the court, after notice
and a hearing, may authorize the obtaining of credit or the incurring of debt –

(1) with priority over any or all administrative expenses of the kind specified in
section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a
lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

Bankruptcy Code Section 364(d)(1) provides:

The court, after notice and a hearing, may authorize the obtaining of credit or the
incurring of debt secured by a senior or equal lien on property of the estate that is
subject to a lien only if –
(A) the [debtor in possession] is unable to obtain such credit otherwise; and
(B) there is adequate protection of the interest of the holder of the lien on the
property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

39.    Bankruptcy Rule 4001(c)(2) provides, in relevant part:

The court may commence a final hearing on a motion for authority to obtain
credit no earlier than 15 days after service of the motion. If the motion so
requests, the court may conduct a hearing before such 15 day period expires, but
the court may authorize the obtaining of credit only to the extent necessary to
avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2).

40.     Bankruptcy Rule 4001(d) provides, in relevant part, that (i) a motion for approval to modify or terminate the automatic stay shall be served on any committee appointed pursuant to Bankruptcy Code Section 1102, on the creditors included on the list filed under Bankruptcy Rule 1007(d), and on such other entities as the court may direct, and (ii) objections may be filed within 15 days of the mailing of the notice of the motion and the time for filing objections thereto. See Fed. R. Bankr. P. 4001(d)(1) - (2).

**A.    The DIP Credit Facility**

41.     As set forth above, based on discussions with potential lenders other than the DIP Lenders, the Debtor was unable to obtain postpetition financing on an unsecured basis or on a junior priority basis to the Prepetition Secured Parties in an amount, and within the timeframe, that the Debtor's current liquidity situation mandated.

42.     The Debtor negotiated the DIP Credit Agreement at arm's length and has determined, in the exercise of its business judgment, that it is the best proposal under the circumstances. When, as here, this judgment is consistent with the provisions of and policies underlying the Bankruptcy Code, courts routinely grant debtors considerable deference in acting in accordance with their business judgment. See, e.g., In re Ames Dept. Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (courts have discretion under Bankruptcy Code § 364 to permit debtors to exercise reasonable business judgment so long as (i) the terms of the financing agreement do not "leverage the bankruptcy process and powers" and (ii) the financing agreement's purpose is primarily to benefit the estate, and not a party in interest).

43.     The financing under the DIP Credit Facility provides additional liquidity to the Debtor sufficient to enable it, inter alia, to (a) minimize disruption to its business and operations, (b) preserve and maximize the value of its estate for the benefit of all creditors and

(c) avoid immediate and irreparable harm to its business, its creditors and their employees, and its assets. Without the financing provided for in the DIP Credit Agreement, the Debtor will not be able to meet its direct operating expenses and will suffer irreparable harm.

44.    The Debtor believes that the terms and conditions of the DIP Credit Agreement represent the Debtor's best option to maximize value for stakeholders and facilitate its sale process. Accordingly, the Debtor requests that the DIP Agent and DIP Lenders be afforded the benefits of Bankruptcy Code Section 364(e) in respect of the DIP Credit Agreement.

45.    Finally, the Prepetition Agent and Prepetition Lenders have consented to the entry of the Interim Order. Based upon the foregoing, the Debtor respectfully requests that the Court approve the DIP Credit Facility in accordance with the terms set forth in the Interim Order and the DIP Credit Agreement.

**B.    Use of Cash Collateral**

46.    In addition to the need for debtor in possession financing, the Debtor requires immediate use of the Cash Collateral pending a final hearing on this Motion. The Debtor requires use of Cash Collateral to be able to pay operating expenses, including payroll, and to pay vendors to restore and ensure a continued supply of goods essential to the Debtor's continued viability.

47.    Bankruptcy Code Section 363(c)(2) provides that the Debtor may not use, sell, or lease cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). The Prepetition Lenders have consented to the Debtor's use of Cash Collateral on the terms and conditions set forth in the Interim Order.

48.     Based upon the foregoing, the Debtor respectfully requests that the Court authorize the Debtor to use the Cash Collateral in accordance with the terms set forth in the Interim and Final Orders and the DIP Credit Agreement.

## C.     Adequate Protection

49.     In exchange for the Debtor's use of the Prepetition Credit Facility Collateral, the Debtor has agreed to provide certain adequate protection to the Prepetition Secured Parties.[13]  Accordingly, the Debtor and the Prepetition Secured Parties have negotiated, and the Debtor requests that the Court approve, as of the Petition Date, certain protections of the Prepetition Secured Parties' interests in the Collateral from any diminution in value, including from the implementation of the DIP Credit Facility and the imposition of the automatic stay pursuant to Bankruptcy Code Section 362.

50.     Such protections include, among other things, granting to all Prepetition Secured Parties (a) replacement liens upon all assets of the Debtor (subject to certain interests and the Carve-Out Expenses, as set forth in the Interim Order) and (b) super priority claims in respect of the adequate protection obligations (subject to the payment of the Carve-Out Expenses).  In addition, (i) the Prepetition Lenders will receive adequate protection payments in the amount of interest, fees (other than an early termination fee, which will be credited in accordance with the provisions of the Fee Letter upon Final Order) and other amounts due under the Prepetition Credit Agreement.

51.     The proposed adequate protection is intended to protect the Prepetition Secured Parties from diminution in the value of their interest in the Prepetition Collateral during the period it is used by the Debtor.  See, e.g. In re Kain, 86 B.R. 506, 513 (Bankr. W.D. Mich.

---

[13]     Bankruptcy Code Section 364(d) requires that adequate protection be provided where the liens of secured creditors are being primed to secure the obligations under a debtor in possession financing facility.  See 11 U.S.C. § 364(d).

1988); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986). The Debtor believes that the proposed adequate protection is the best available under the circumstances and is in accord with Bankruptcy Code Section 361.

52.    The Prepetition Lenders have agreed based upon the adequate protection set forth in the Interim Order to consent to the use of their Cash Collateral. Based upon the foregoing, the Debtor respectfully requests that the Court authorize the Debtor to access the Prepetition Collateral, including, without limitation, the Cash Collateral, and to provide adequate protection in accordance with the terms set forth in the Interim Order and the DIP Credit Agreement.

**D.    Modification of the Automatic Stay.**

53.    Bankruptcy Code Section 362 provides for an automatic stay upon the filing of a bankruptcy petition. The proposed DIP Credit Facility contemplates the modification of the automatic stay (to the extent applicable), to the extent necessary to permit the Administrative Agent and/or the DIP Lenders to perform any act authorized or permitted under, or by virtue of, the Interim Order or the DIP Credit Agreement.

54.    Stay modification provisions of this type are standard features of postpetition debtor in possession financing facilities and, in the Debtor's business judgment, are reasonable under the present circumstances. Accordingly, the Debtor respectfully requests that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim Order and DIP Credit Agreement.

**E.    Interim Approval of the DIP Credit Facility**

55.    As set forth above, Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral pursuant to Bankruptcy Code Section 363 or to obtain credit under Bankruptcy Code Section 364 may not be commenced earlier than 15 days after the

service of such motion.   Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and to authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

56.    The Debtor respectfully requests that the Court schedule and conduct a preliminary hearing on the Motion and authorize the Debtor from the entry of the Interim Order until the Final Hearing to obtain credit under the terms contained in the DIP Credit Agreement and to utilize Cash Collateral.

**F.    Establishing Notice Procedures and Scheduling Final Hearing**

57.    Notice of this Motion will be given by facsimile, electronic mail, overnight courier or hand delivery to: (i) the United States Trustee for the District of Delaware; (ii) each of the Debtor's twenty (20) largest unsecured creditors; (iii) counsel to the Prepetition Agent for itself and for the Prepetition Lenders; and (vi) counsel to the DIP Agent for itself and for the DIP Lenders (collectively, the "Initial Notice Parties"). The Debtor submits that, under the circumstances, no further notice of the hearing on the interim financing is necessary and request that any further notice be waived.

58.    The Debtor further respectfully requests that the Court schedule the Final Hearing and authorize the Debtor to mail copies of the signed Interim Order, which fixes the time, date and manner for the filing of objections, to the Initial Notice Parties and (i) any party that has filed prior to such date a request for notices with this Court; (ii) counsel for any official committee(s); (iii) the Securities and Exchange Commission; and (iv) the Internal Revenue Service. The Debtor requests that the Court consider such notice of the Final Hearing, including without limitation, notice that the Debtor will seek approval at the Final Hearing of (x) a waiver of rights under Bankruptcy Code Section 506(c) and (y) the granting of liens on proceeds of

Avoidance Actions to the DIP Agent and the DIP Lenders, to be sufficient notice under Bankruptcy Rule 4001 and Local Rule 2002-1.[14]

59.    No previous request for the relief sought herein has been made to this Court or any other court.

---

[14] Local Rule 2002-1(b) provides that "[i]n chapter 11 cases, all motions . . . shall be served only upon counsel for the debtor, the United States Trustee, counsel for all official committees, all parties who file a request for service of notices under Fed. R. Bankr. P. 2002(i) and all parties whose rights are affected by the motion.  If an official unsecured creditors' committee has not been appointed, service shall be made on the twenty (20) largest unsecured creditors in the case in lieu of the creditors' committee."

## CONCLUSION

WHEREFORE the Debtor respectfully request that the Court (i) enter an order substantially in the form of the proposed Interim Order; (ii) after the Final Hearing, enter the Final Order substantially in the form that shall be filed with the Court; and (iii) grant to the Debtor such other and further relief as is just.

Dated: January 14, 2009
      Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Lee E. Kaufman (No. 4877)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

Stephen H. Warren
Karen Rinehart
Alexandra B. Redwine
Ana Acevedo
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

*Proposed Attorneys for the Debtor and Debtor-in-Possession*